UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETRE SIMOSKI,

    Plaintiff,

v.

EATON STEEL BAR CO., INC.,

    Defendant.
                                        /

Case No. 04-74981

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [32]**

Defendant Eaton Steel Bar Co., Inc., brings this Motion for Summary Judgment of Plaintiff Petre Simoski's employment discrimination lawsuit. For the reasons discussed below, the Court GRANTS Defendant's Motion.

**I.    Background**

Defendant is a steel supplier operating a shipping warehouse in Oak Park, Michigan. Plaintiff, a white man, was hired as a "shipper" at the Oak Park warehouse in 1996.

Plaintiff is a member of a union, the United Steelworkers of America, AFL-CIO-CLC, Local 1358. He is a party to a Collective Bargaining Agreement ("CBA") between his union and Defendant, which provides in part, "The Company shall manage the plant and direct the working forces. The management of the plant includes the right to . . . hire, promote, suspend, or discharge employees for proper cause . . . ." (Br. of Def. Ex. 6 at 6.) The CBA further states, "Cases of employees claiming to have been unjustifiably discharged shall come within the purview of [the CBA] . . ., and shall be decided in accordance therewith."

(*Id.* at 12.)  The CBA provides for a several-step grievance procedure, and states that a terminated employee's failure to file a wrongful discharge claim pursuant to the grievance procedure constitutes waiver.  (*Id.*)

Plaintiff alleges that there was significant racial tension at Defendant's Oak Park facility, in part because "they have systematically eliminated the majority of the Caucasians there."  (Br. of Def. Ex. 7 at 96.)  In his affidavit, Plaintiff describes several instances of what he perceived to be reverse racial discrimination:

> I was rebuffed and ostracized by African-American employees, including called, "honkey," "boy," "peckerwood" and "little bitch."  Most of the name calling was from my African-American supervisors.  On one occasion, a Black employee slapped the back of my head with an open palm.  I reported the foregoing incident to Steven Lutren, the plant manager, and he suspended *me*, the victim.
>
> Steve Lutren . . . bent over backwards to not be called racist by the Black employees, the result being that Lutren discriminated against the White employees. . . .  I made several reports to Steve Lutren that work was distributed according to race, etc.  It ended up that I was the only White shipper left, although several Whites were hired during my time at Eaton.
>
> I personally saw Tom Howard, a Black supervisor, punching a White employee and the White employee, Mike Patterson, subsequently left the warehouse.  Patterson filed a grievance.  Howard was sent to anger management.
>
> I saw a Black employee purposely tossed a glass juice bottle at a White employee, but missed hitting the White employee when he dodged out of the way.  The bottle struck a Black employee in the face by his eye.  The man who threw the bottle was not disciplined or terminated.
>
> Craig Leja, a White employee, threatened another White employee and was fired by Steve Lutren.  Black employees threatened White employees continuously, and they were <u>never</u> fired.
>
> When I reported racist incidents to Steve Lutren . . . , Dennis Brown, who is African-American, became angry and told me he was going to "beat your ass," and called me, "my little bitch" which I took to mean that he was calling me a homosexual.  Andrew Watkins pushed Dennis Brown out of the door

> to keep him from attacking me. Lutren took no action. Although I reported racist incidents to Lutren, he took no action and as far as I am aware conducted no investigation.

(Br. of Pl. Ex. 1 (paragraph numbers omitted) (emphasis in original).)[1]

Plaintiff's deposition is more specific.[2] For example, it appears that Plaintiff was called "boy" once (as were African-American employees), a "peckerwood" (which he understood to be a "southern white person") three or four times but "joked it off," and a "honkey . . . [a]round five times" before he ignored it and "they went away." He explains that he is uncertain whether many of the comments were directed at him, because "it's like if you have six guys standing there, and then you hear the word, you don't sit there asking questions. You just keep walking. You ignore it." Plaintiff also explains, however, that when the comments were made, he was "the only white person there." (Br. of Def. Ex. 7 at 58, 89-90, 93, 171).

Perhaps as a result of this tension, Plaintiff encountered a number of disciplinary problems including written warning notices for fighting and for making verbal threats. For example, he was given four warning notices in 1998: two for safety violations; one for "malicious use of abusive, vulgar, or threatening language to a fellow employee"; and one for fighting. In 2000, Plaintiff received two warning notices for failing to sign out equipment. In 2003, Plaintiff was given a warning notice for substandard productivity and inappropriate

---

[1] At least one of Plaintiff's statements is directly contradicted by his deposition testimony. His affidavit states, "I saw a Black employee purposely tossed a glass juice bottle at a White employee . . . ." However, when asked during his deposition, "But you didn't see it, did you?", Plaintiff responded, "No, I didn't have to. The lump was there." (Br. of Def. Ex. 7 at 58.)

[2] This analysis may be limited by the fact that Defendant has only submitted portions of the deposition and Plaintiff has submitted no part of it.

conduct. The 2003 notice stated in bold letters at the bottom, "FINAL NOTICE!!" Regarding that notice, Plaintiff stated in a grievance report, "Comments I made to coworker were inappropriate. Please excuse my inability to contain my frustration." (Br. of Def. Ex. 1.)

On June 7, 2004, Plaintiff began his workday sitting at a desk calibrating his instruments. He sat directly behind a steel-reinforced window, which separated his room from a break room where several employees waited in line to punch out of work after their shift had ended. One of those employees, an African-American named Derek Hallman, tapped and pounded his hands against the glass "to the beat of a song." After unsuccessfully asking Hallman to stop, Plaintiff tried to ignore the noise. Then, apparently frustrated, Plaintiff picked up a stapler and threw it at the window, breaking the glass. Pieces of glass struck Hallman in the head. (Br. of Pl. Ex. 1; Br. of Def. Ex. 7 at 195-99; Br. of Def. Ex. 2.) Plaintiff states that the stapler left "roughly a diameter of let's say eight to twelve inches crack" in the window. It was "just small of a frisbee size." (Br. of Def. Ex. 7 at 219.)[3] Then, Hallman and another African-American employee, Wyman Stewart, continued beating on the glass, worsening the damage. Hallman and Stewart gave each other "high fives" when they finished. (*Id.* at 219-20; Br. of Pl. Ex. 1.) Shortly later, Plaintiff was terminated for destruction of property.

On December 3, 2004, Plaintiff filed a lawsuit against Defendant in Oakland County, Michigan, Circuit Court. The short Complaint cites only one legal basis of this lawsuit:

---

[3]This characterization comes from Plaintiff's deposition. In his affidavit, Plaintiff's tone changes somewhat: "I tossed a plastic stapler in the direction of the window in an effort to get him to stop [pounding]. The window suffered a minor crack." (Br. of Pl. Ex. 1.)

Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. L. § 37.2201, *et seq.* (Doc. 1 at 4-5.) The Complaint alleges race discrimination, hostile environment discrimination, intentional discrimination, and wrongful discharge. (*Id.* at 5-8.) Counts I-III are unmistakable discrimination claims. Plaintiff's Count IV sounds in somewhat different terms, however. Although it incorporates by reference the entirety of the Complaint, Count IV specifically alleges that Defendant's policies and procedures created a legitimate expectation that Plaintiff would be discharged only for cause, and that Defendant did not have just cause to terminate him.

On December 22, 2004, Defendant filed a Notice of Removal in this Court. On January 13, 2005, Plaintiff filed a Motion to Remand the case to state court. Plaintiff explained each of his four claims and the state law grounds upon which they rest. On April 15, 2005, this Court denied Plaintiff's Motion to Remand. The Court reasoned that Plaintiff's Count IV may be a contract claim or a public policy claim. In either event, the Court held, resolution of Count IV requires interpretation of the CBA, since the CBA is Plaintiff's basis for the expectation that he would be fired for just cause only. (Doc. 17 at 3-4.)

## II. Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an

5

element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the Court must "construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Id.* The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Discussion

As noted above, Plaintiff's Complaint alleges four separate claims. Three of the claims allege discrimination and the fourth alleges wrongful discharge. Because two of the discrimination claims appear identical, they are addressed in unison.

#### A. Counts I and III

In Counts I and III of the Complaint, Plaintiff alleges racial discrimination and intentional discrimination, respectively, under the Michigan Elliot-Larson Civil Rights Act, Mich. Comp. L. § 37.2201 *et seq.* Plaintiff appears to concede that these two claims are identical.

Because Michigan civil rights statutes generally mirror their federal counterparts, Michigan courts typically follow federal civil rights case law to interpret them.  *See*, *e.g.*, *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 192-95 (Mich. 2003).  In an employment discrimination case, a plaintiff may present either direct evidence of discrimination, or indirect evidence of discrimination per the formula set forth in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v Burdine*, 450 U.S. 248 (1981).  Plaintiff pursues the latter line of attack, arguing that "[t]his is basically[] a conduct case in that Plaintiff is alleging that similarly situated black employees engaged in conduct of 'comparable seriousness' to that engaged in by him and suffered no adverse employment consequences."  (Br. of Pl. at 8.)

To establish a prima facie case of discrimination, Plaintiff must demonstrate four elements: 1) membership in a protected class; 2) qualification for the position; 3) an adverse employment action; and 4) similarly situated persons outside of the protected class received favorable treatment.  *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254.  *See also Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64, 68 (Mich. 1997).

As to the fourth element,

> the plaintiff must show that the "comparables" are similarly-situated in all respects.  Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff identifies a number of "comparables"--African-Americans whom he alleges were similarly situated and engaged in similar conduct but were treated more favorably.

These include an employee who struck several I-beams with a hi-lo tractor, another who threw a juice bottle, another who turned over an office desk, and others who watched basketball games when they were supposed to be working.

The parties spend the majority of their arguments debating whether this conduct is sufficiently similar to Plaintiff's, but the Court need not resolve that question. Even if one of these African-American employees had engaged in exactly the same behavior as Plaintiff, there is no evidence that any of them had the same work history as Plaintiff. The absence of disciplinary problems such as Plaintiff's is certainly the sort of "differentiating or mitigating circumstance[] that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Plaintiff's repeated disciplinary problems--especially his most recent written warning, which stated in bold letters, "FINAL WARNING!!"--differentiate him from the African-American colleagues he identifies.

Moreover, even assuming that Plaintiff can establish a prima facie case of discrimination, he cannot overcome Defendant's nondiscriminatory justification for terminating his employment. "[O]nce the employer has come forward with a nondiscriminatory reason for firing the plaintiff, . . . the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Defendant cites its Rules and Regulations, which provide for immediate discharge for the damage or destruction of its property. (Br. of Def. Ex. 8.) Because Defendant has carried its burden to produce a nondiscriminatory justification for Plaintiff's termination, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 (footnote omitted).

Plaintiff has neither shown that Defendant's proffered justification has no basis in fact, given any reason to believe that his misconduct did not actually motivate his termination, or shown why the destruction of a window is an insufficient reason for termination. Thus, he has provided no basis to reject Defendant's race-neutral justification for terminating his employment. *Manzer*, 29 F.3d at 1084.

### B. Count II

In Count II of the Complaint, Plaintiff alleges "hostile environment discrimination." Under Michigan law,

> there here are five necessary elements to establish a prima facie case of a hostile work environment:
>
> (1) the employee belonged to a protected group;
>
> (2) the employee was subjected to communication or conduct on the basis of [race];
>
> (3) the employee was subjected to unwelcome [racial] conduct or communication;
>
> (4) the unwelcome [racial] conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
>
> (5) respondeat superior.

*Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993). *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (applying *Radtke*'s elements to racial harassment case).

There does not appear to be any real dispute as to whether Plaintiff has presented sufficient evidence to meet the first three of these elements. Plaintiff belonged to a protected group and he alleges that he was subject to unwelcome communication and conduct on the basis of his classification in that protected group. Similarly, because

9

Plaintiff states that he "reported racist incidents to Lutren" (Br. of Pl. Ex. 1 at 3), he has established respondeat superior, the fifth element. *See Radtke*, 501 N.W.2d at 169 n. 46 ("liability exists where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor") (quoting *Steele v. Offshore Shipbuilding, Inc*, 867 F.2d 1311, 1316 (11th Cir. 1989)). The fourth element presents a more difficult question.

In *Radtke*, the Michigan Supreme Court held that "whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive work environment." 501 N.W.2d at 167. Thus, an objective standard guides the Court's analysis.

Defendant relies on *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314 (Mich. 1996), for its argument that Plaintiff's allegations lack the requisite specificity required under Michigan law.[4] In that age discrimination case, the Michigan Supreme Court upheld dismissal of a

---

[4]Defendant attempts to characterize *Quinto* as a case in which the employee was subject to a wide array of discriminatory slurs and unfair criticism:

> Plaintiff alleged that her supervisor called her "dumb Dego," "incompetent," "coo-coo," "stupid," "old lady," "granny," and stated she "don't understand anything" and "continually harassed [her] by demeaning and humiliating [her] in front of fellow employees." . . . The Michigan Supreme Court held that Plaintiff's specific and general allegations were insufficient as a matter of law to establish a hostile environment claim.

(Br. of Def. at 17.)

Defendant grossly misrepresents the facts and holding in *Quinto*. The Michigan Supreme Court actually *refused to consider* six of these seven allegations because the

complaint where the plaintiff's "affidavit disclosed no specific instances of ethnic, sexist, or 'ageist' remarks hostile to a protected class from which an inference of a hostile work environment could be drawn. It did not describe with particularity when, where, or how plaintiff was harassed." *Id.* at 320. The court held that the plaintiff's conclusory allegations of "harassing comments regarding her age, sex, national origin, and ability to speak English" did not create a genuine issue of material fact. *Id.*

This case is somewhat similar to *Quinto* in that a number of Plaintiff's allegations lack specificity. For example, Plaintiff states that "[t]hroughout [his] employment at Eaton, [he] was rebuffed and ostracized by African-American employees" (Br. of Pl. Ex. 1 at 2.); that his African-American supervisor, Dennis Brown, "was himself the perpetrator of much of the discrimination and witnessed the other discrimination I endured" (*Id.* at 4 (emphasis in original)); and that "Black employees threatened White employees continuously," prompting white employees to leave "because of the hostile work environment, including physical attacks by Black coworkers and black *supervisors*." (*Id.* at 3-4.) Consistent with *Quinto*, the Court does not find these conclusory allegations sufficient to raise a genuine issue of material fact.

Several of Plaintiff's allegations are more specific, however. He states that he was called "honkey," "boy," and "peckerwood," and that "[m]ost of the name-calling was from

---

plaintiff presented them in an affidavit "filed with a motion for rehearing, *after* the trial court granted defendant's dispositive motion." 547 N.W.2d at 367 n.5 (emphasis in original). In affirming summary disposition, the court found that the plaintiff's allegations, including her claim that the defendant "continually harassed [the plaintiff] by demeaning and humiliating [her] in front of fellow employees," *id.* at 367, lacked specificity. *Id.* at 320. Indeed, the derogatory terms in *Quinto* that Defendant now cites may very well have cured the specificity problem, if the court had actually considered them.

African-American supervisors." (*Id.* at 2.) He states that an African-American employee once slapped him in the back of the head. (*Id.*) He states that when he reported "racist incidents" to the plant manager, his African-American supervisor, Dennis Brown, told him that he would "beat your ass," called him "my little bitch," and tried to attack him but was restrained. (*Id.* at 3 (emphasis in original).) Plaintiff states that he witnessed an African-American supervisor punching a white employee (*Id.* at 3) and heard about an African-American employee tossing a glass bottle at a white employee (but instead hitting an African-American employee). (Br. of Def. Ex. 7 at 58.) Thus, Plaintiff has alleged a number of specific instances of racial discrimination by Defendant's employees and supervisors. This is not a litany of mere "conclusory allegations" as in *Quinto*. Plaintiff's evidence is much more specific.[5]

Specificity alone, however, does not resolve whether the incidents were of such a nature that they would lead "a reasonable person, in the totality of circumstances, [to] perceive[] the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive work environment." *Radtke*, 501 N.W.2d at 167.

---

[5] Defendant also argues that Plaintiff has failed to specify that the alleged incidents occurred within the three-year statute of limitations. In *Garg v. Macomb County Community Mental Health Services*, 696 N.W.2d 646 (Mich. 2005), the Michigan Supreme Court rejected the "continuing violations" doctrine and held that "a person must file a claim under the Civil Rights Act within three years of the date his or her cause of action accrues . . . ." *Id.* at 659. Defendant argues that the Court should exclude any evidence the age of which is unclear. While Plaintiff fails to put a precise date on many of the discriminatory incidents he alleges, uncertainty is insufficient to find in favor of Defendant. Defendant points to no evidence--such as existed in *Garg*--demonstrating that the incidents occurred more than three years ago. For purposes of this Motion for Summary Judgment, Defendant has the initial burden to show the absence of a genuine issue of material fact. Perhaps the incidents are time-barred, but Defendant has not demonstrated that to be the case.

The fundamental flaw of Plaintiff's evidence is that so little of it has anything to do with race. He has provided no basis even to infer that the slap, punch, or bottle that his African-American colleagues allegedly threw at their white counterparts were at all race-related. Nor does he show why his supervisor's threat and use of "my little bitch" was racially motivated. And given that his supervisor called African-American employees "boy" as well, it is difficult to see a racial motivation behind the use of that word. This leaves only the use of the words "honkey" and "peckerwood" four or five times each by a few African-American employees.

Plaintiff argues that the Court would be incorrect to separate the above incidents, relying primarily on *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999). In that case, however, the plaintiff showed a racial component to far more incidents. To name just a few, the African-American employees endured near-constant harassment including swastikas, racial slurs such as "stupid damn nigger," and derogatory phrases such as "do as he is told," "nigger rigged," and "up to our asses in nigger sludge." Racist graffiti was ever-present at the workplace and a "Black O' Lantern" was hung. The words "Nigger Sucker" were scrawled across an employee's name tag. *See id.* at 651-55. It seemed that the shameless instigators would stop at nothing to threaten and intimidate their African-American colleagues. In a sharply worded opinion, the Sixth Circuit held that such practices, even when seemingly distinct from one another and involving different people, cannot be ignored in harassment cases. "[A] court should not examine each alleged incident of harassment in a vacuum, as 'what may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of

13

several other related incidents.'" *Id.* at 661 (quoting *Vance v. Southern Bell Tel. & Telegraph Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989)).

This Court agrees with Plaintiff that *Jackson* is a rightly decided and important precedent. But that case does not control the outcome of this distinguishable facts presented here. Plaintiff may very well have had a poor relationship with his coworkers, but there is insufficient evidence to support a finding that this poor relationship was related to race. The use of two apparently derogatory words a few times by a few employees would not support a reasonable jury verdict in Plaintiff's favor.

### C. Plaintiff's Count IV

Count IV of Plaintiff's Complaint alleges "wrongful discharge." Specifically, "Defendant had policies and procedures in place at the time of Plaintiff's discharge which created a legitimate expectation on Plaintiff's part that he would be discharged only for cause." (Doc. 1 at 7-8.)

Defendant's "policies and procedures" regarding termination are found in the text of the CBA, which states that Defendant may "discharge employees for proper cause." (Br. of Def. Ex. 6 at 6.) The CBA further provides that "[c]ases of employees claiming to have been unjustifiably discharged" fall within the purview of the CBA's grievance procedure, and that if a terminated employee fails to file a claim within three days of discharge, the claim "shall be considered as having been waived by the employee . . . ." (*Id.* at 12.)

Because Plaintiff's Count IV depends on a reading of the CBA, this Court has previously held that this entire case is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. (Doc. 17.) See

"Since [Plaintiff's] claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced.  For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement."  *Vaca v. Sipes*, 386 U.S. 171, 184 (1967) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650 (1965)).  Thus, as Defendant correctly argues, Plaintiff's failure to avail himself to the CBA's grievance and arbitration procedure precludes him from now pursuing this wrongful discharge litigation.  *See, e.g.*, *Maddox*, 379 U.S. at 652; *Hines v. Anchor Motor Freight*, 424 U.S. 554, 563 (1976); *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1040 (6th Cir. 1989).

Plaintiff does not argue that exhaustion of administrative remedies is not a prerequisite to a claim under Section 301.  Rather, Plaintiff contends that this is not a Section 301 case--that his claim does not rest on the CBA at all, but on some other understanding of Defendant's "policies and procedures."  In effect, Plaintiff is rearguing his Motion to Remand, rather than providing any new reason why Count IV of his Complaint might entitle him to relief.  The Court has already rejected Plaintiff's arguments.

**IV.   Conclusion**

Being fully advised in the premises, having read the pleadings, and for the reasons discussed above and on the record, the Court hereby GRANTS Defendant's Motion for Summary Judgment.

                        s/Nancy G. Edmunds
                        Nancy G. Edmunds
                        United States District Judge

Dated: March 21, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 21, 2006, by electronic and/or ordinary mail.

                        s/Carol A. Hemeyer
                        Case Manager